UNITED STATES of America

v.

Darius FULLMER, Appellant,

United States of America

v.

Andrew Stepanian, Appellant,

United States of America

v.

Kevin Kjonaas a/k/a Kevin Jonas a/k/a Steve Shore a/k/a Jim Fareer, Kevin Kjonaas, Appellant,

United States of America

v.

Joshua Harper, Appellant,

United States of America

v.

Lauren Gazzola, Appellant,

United States of America

v.

Stop Huntingdon Animal Cruelty USA, Inc., Appellant,

United States of America

v.

Jacob Conroy, Appellant.

Nos. 06–4211, 06–4296, 06–4339, 06–4436, 06–4437, 06–4438, 06–4447.

United States Court of Appeals, Third Circuit.

Argued Jan. 6, 2009.

Opinion Filed: Oct. 14, 2009.

H. Louis Sirkin (Argued), Sirkin Pinales & Schwartz LLP, Cincinnati, OH, for Appellant Lauren Gazzola.

Robert G. Stahl (Argued), Laura K. Gasiorowski, Stahl Farella & Sarokin, Westfield, NJ, for Appellant Kevin Kjonaas.

Peter Goldberger (Argued), Ardmore, PA, for Appellant Joshua Harper.

Robert A. Obler, Lawrenceville, NJ, for Appellant Darius Fullmer.

Paul J. Hetznecker, Philadelphia, PA, for Appellant Andrew Stepanian.

Andrew F. Erba, II, Williams, Cuker, & Berezofsky, Philadelphia, PA, for Appellant Stop Huntingdon Animal Cruelty USA, Inc.

Hal K. Haveson, Haveson & Otis, Princeton, NJ, for Appellant Jacob Conroy.

Glenn J. Moramarco (Argued), George S. Leone, Assistant United States Attorney, Camden Federal Building & Courthouse, Camden, NJ, for Appellee.

Matthew Strugar, Esq., Center for Constitutional Rights, National Lawyers Guild, First Amendment Lawyers Association, New York, NY, Amici Curiae–Appellants.

Before: FUENTES and FISHER, Circuit Judges and DITTER,* District Judge.

## OPINION OF THE COURT

FUENTES, Circuit Judge:

Defendants Darius Fullmer, Andrew Stepanian, Kevin Kjonaas, Joshua Harper, Lauren Gazzola, Jacob Conroy, and Stop Huntingdon Animal Cruelty ("SHAC") collectively challenge their convictions for conspiracy to violate the Animal Enterprise Protection Act ("AEPA"), 18 U.S.C. § 43 (2002). Notably, our interpretation of this statute is an issue of first impression in this, or any, circuit court of appeal.[1]

SHAC, Kjonaas, Gazzola, and Conroy also challenge their convictions for conspiracy to commit interstate stalking, as well as three substantive counts of stalking. Finally, SHAC, Kjonaas, Gazzola, Conroy,

and Harper challenge their convictions for conspiracy to use a telecommunications device to abuse, threaten, and harass.

The overarching issues in this appeal are whether the AEPA violates the First Amendment, whether there was sufficient evidence to convict Defendants of the various charges against them, and challenges to the jury instructions. Because we find that the AEPA is neither unconstitutional on its face, nor unconstitutional as-applied to SHAC, Kjonaas, Gazzola, Conroy, Stepanian, Harper and Fullmer, we will affirm their convictions for conspiracy to violate the AEPA. In addition, we find that there was sufficient evidence to convict Defendants on all charges involving interstate stalking. Finally, we find no flaw in the jury instructions, and we will therefore affirm the Judgment of the District Court in all other respects.

## I.

We begin by setting forth the two principal statutes implicated by the lengthy facts of this case: The version of the AEPA in force at the time of the conduct at issue provided, in relevant part

Whoever—

(1) travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility in interstate or foreign commerce for the purpose of causing physical disruption to the functioning of an animal enterprise; and

(2) intentionally damages or causes the loss of any property (including animals or records) used by the animal enterprise, or conspires to do so,

and intimidation against third parties that are related to or associated with animal enterprises are themselves substantive violations of the AEPA.

---

* Honorable J. William Ditter, Jr., District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Congress revised the AEPA in 2006 to make clear that threats of vandalism, harassment,

shall be punished as provided for in subsection (b).

18 U.S.C. § 43(a)(1)-(2) (2002). The interstate stalking statute provides, in relevant part

> Whoever travels in interstate or foreign commerce ... with the intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, or causes substantial emotional distress to that person, a member of the immediate family ... of that person, or the spouse or intimate partner of that person ... shall be punished as provided in section 2261(b) of this title.

18 U.S.C. § 2261A(1) (2000).

### A.

Huntingdon Life Sciences ("Huntingdon") is a research corporation that performs testing for companies seeking to bring their products to market. The testing that Huntingdon provides to its clients is mandated by the laws and regulations of the United States and Europe to ensure the safety and efficacy of pharmaceuticals, agricultural products, veterinary products, and medical implants. Huntingdon has three laboratories, two in the United Kingdom and one in New Jersey. All Huntingdon laboratories use animals as test subjects. Approximately eighty-five percent of the animals used by Huntingdon are rats and mice, and the remaining fifteen percent is composed of other species, including fish, dogs, monkeys, and guinea pigs.

In the late 1990s, an individual posing as a laboratory technician videotaped the conditions inside a Huntingdon laboratory in the United Kingdom. The footage, which depicted animal abuse, became public when it was used in a television program, igniting protests against Huntingdon by a number of animal rights organizations. At about the same time, Stop Huntingdon Animal Cruelty was formed in the United Kingdom ("SHAC–UK"). The organization's mission is to close Huntingdon laboratories.[2]

Immediately after SHAC–UK formed in November 1999, the organization published a newsletter that listed the names and addresses of the Huntingdon directors in the United Kingdom. Following the publication of the newsletter, animals rights protestors subjected the Huntingdon directors to an ongoing campaign of harassment, including vandalizing their homes and cars.

In February 2001, the Chief Operating Officer and Managing Director of Huntingdon, Brian Cass, was physically assaulted by three masked individuals in front of his home in England. Cass suffered cracked ribs, several lacerations, and a four-inch gash on his head that required nine stitches. David Blinkinsopp, who had been identified in video footage of SHAC–UK protests in front of Huntingdon, was convicted of the assault. The remaining two assailants were never identified.

SHAC–UK's campaign evolved to include companies and individuals who were associated with Huntingdon, such as suppliers and customers. In addition, SHAC–UK began to target Huntingdon's shareholders, demanding that the shareholders sell their stock in Huntingdon or face twenty-four hour demonstrations at their homes. Because the laws in the United

---

2. The activities of SHAC–UK are relevant to this case only to the extent that they explain the state of mind and perceptions of those targeted by Defendants in this case. SHAC–UK is not a party to this action.

Kingdom require companies to publish the names and addresses of their shareholders, Huntingdon relocated its financial base to the United States in an effort to protect its shareholders. SHAC then formed a branch in the United States to target the New Jersey-based branch of Huntingdon. The New Jersey branch of SHAC is one of the Defendants in this action.

### B.

SHAC's campaign was multi-faceted in its approach, targeting companies that were directly and indirectly involved with Huntingdon, as well as the people who worked for those companies.[3] Because of the length of the record, we recount only a representative sample of the incidents that are the subject of this case. In particular, we discuss the general content of SHAC's website and the protest activity coordinated through the SHAC website, including protests directed at specific individuals.

### SHAC Website

SHAC's primary organizing tool is its website, through which members coordinate future protests. It also publishes information about protests that have previously taken place.

The website includes a page dedicated to the concept of "direct action," which all parties concede is a type of protest that includes the illegal activity in this case. With regard to its position on the use of direct action, SHAC stated the following on its website:

We operate within the boundaries of the law, but recognize and support those who choose to operate outside the confines of the legal system.

Big business has shown time and time again their lack of concern for ethics, instead focusing their attention on their profit. Often, simply targeting said business proves fruitless. However, as above ground activists have successfully targeted [Huntingdon]'s financial pillars of support, underground activists have too targeted [Huntingdon]'s pocketbooks. Unidentified individuals as well as underground cells of the Animal Liberation Front and the Earth Liberation Front have engaged in economic sabotage of [Huntingdon] and their associates.

They have also spent their time directly intervening and liberating the animals who are slated to die inside of [Huntingdon]. Animals have been liberated from breeders as well as the laboratories themselves.

SHAC does not organize any such actions or have any knowledge of who is doing them or when they will happen, but [SHAC] encourage[s] people to support direct action when it happens and those who may participate in it.

(J.A. at 775.)

The website often posted the organization's "accomplishments," which lauded

---

3. The record reflects that SHAC targeted at least ten different companies and their employees during the course of its campaign to close Huntingdon. These companies include Spencer Edwards Inc., which facilitated the trade of Huntingdon stock; Focal Communications, Huntingdon's telephone and internet service provider; Stephens, Inc., an investment banking company that loaned money to Huntingdon; Forest Laboratories, a pharmaceutical company and Huntingdon client; Bank of New York, which facilitated stock purchases by American investors when Huntingdon was based in England; Quilcap, an investment fund management company; Marsh, Inc., which provided insurance brokerage services to Huntingdon; Chiron, a biopharmaceutical company and client of Huntingdon; Deloitte and Touche, Huntingdon's auditor; and Charles Schwab, a stockbroker for Huntingdon.

both legal and illegal protest activity. The illegal activity included, among other things, a break-in at the Huntingdon lab in New Jersey, during which protestors broke windows and "liberated 14 beagles," in addition to overturning a worker's car; detonating a "stink bomb" in the Seattle office of a Huntingdon investor; destroying Bank of New York ATMs, windows, and other property; sinking a yacht owned by the Bank of New York's president; launching repeated "paint attacks" in the New York offices of a Huntingdon investor; and "rescuing" dogs and ferrets from a Huntingdon breeder farm.

The website also posted "anonymous" bulletins of successful, but illegal, protest activities. One such bulletin stated

> Late last night, August 30th, we paid a visit to the home of Rodney Armstead, MD and took out two of his front windows ... gave him something to labor over this Labor Day weekend. Rodney serves as an officer and agent of service for "Medical Diagnostic Management, Inc.," a scummy little company [associated with Huntingdon]. Any ties with [Huntingdon] or its executives will yield only headaches and a mess to clean up.

(J.A. at 935.) The name and home address of Dr. Armstead followed. This bulletin was prefaced by SHAC's statement that it was "excited to see such an upswing in action against Huntingdon and their cohorts. From the unsolicited direct action to the phone calls, e-mails, faxes and protests. Keep up the good work!" Similar bulletins included photographs of extensive vandalism at the homes of people indirectly affiliated with Huntingdon, such as employees of Bank of New York. These bulletins almost always contained a disclaimer that "all illegal activity is done by anonymous activists who have no relation with SHAC." (J.A. at 1233.)

The SHAC website also posted a piece called the "Top 20 Terror Tactics" that was originally published by an organization that defends the use of animals in medical research and testing. With its standard disclaimer about SHAC not organizing illegal activity, SHAC re-published the list on its website. Some of the tactics included abusive graffiti, posters, and stickers on houses, cars, and in neighborhoods of targeted individuals; invading offices, damaging property, and stealing documents; chaining gates shut or blocking gates with old cars to trap staff on site; physical assaults against the targeted individuals, as well as their partners, including spraying cleaning fluid into their eyes; smashing windows in houses when the occupants are home; flooding houses with a hose attached to an outside tap inserted through a letterbox or window while the home is unoccupied; vandalizing personal vehicles by gluing locks, slashing tires, and pouring paint on the exterior; smashing personal vehicles with a sledgehammer while the targeted individual is inside; firebombing cars, sheds and garages; bomb threats to instigate evacuations; threatening telephone calls and letters, including threats to injure or kill the targeted individual, as well their children and partners; abusive telephone calls and letters; ordering goods and services in the targeted individual's name and address; and arranging for an undertaker to collect the target's body. Following the list, the SHAC website stated, "Now don't go getting any funny ideas!" (J.A. at 780.)

The website had a series of links dedicated to educating activists on how to evade investigators. These links were entitled, "Ears and Eyes Everywhere," "Dealing with Interrogation," "When an Agent Knocks," and "Illegal Activity." In these sections of the website, SHAC advised its protesters to "never say anything over the phone, email or in your house or

car that you wouldn't want the authorities to hear. If you need to discuss sensitive information, do it in a remote location. Burn anything with sensitive information on it. . . . Visit www.pgp.com and download an email encryption program to protect your email conversations." (J.A. at 1512.) "PGP" stands for "pretty good privacy," and that encryption device was generally effective at protecting e-mail conversations from outside monitoring. (J.A. at 3095–99.) PGP is also used to erase data from hard drives. The software was found on eight of the nine computers at SHAC's de facto headquarters where three Defendants also lived.

Through its website, SHAC also invited its supporters to engage in electronic civil disobedience against Huntingdon and various companies associated with Huntingdon. Electronic civil disobedience involves a coordinated campaign by a large number of individuals to inundate websites, e-mail servers, and the telephone service of a targeted company. Electronic civil disobedience also includes the use of "black faxes," repeatedly faxing a black piece of paper to the same fax machine to exhaust the toner or ink supply. SHAC sponsored monthly electronic civil disobedience campaigns on the first Monday of every month. SHAC reminded its supporters that electronic civil disobedience is illegal, so supporters should only participate if they "are like Martin Luther King and are ready to suffer the consequences . . . or if [the supporters] want to live to fight another day, do the electronic civil disobedience from a public computer that cannot be traced. . . ." (J.A. at 835.)

Another way that SHAC encouraged the use of electronic civil disobedience was through its "Investor of the Week" feature, which highlighted a company associated with Huntingdon by publishing the company's contact information. SHAC told its supporters to "Take advantage of pay phones! Especially with toll free numbers! [sic]" (J.A. at 788.) The website also provided a link to a black fax for their personal use. Alternatively, the website noted that supporters could just use black paper to "give your target's fax machine a run for its money . . . or ink!" (*Id.*) The website explained how a supporter could block his phone number so that it would not appear on the fax or telephone line's caller identification. In addition, the website explained how to prevent the targeted company's servers from blocking e-mails, and provided a link to encryption devices that mask the sender.

One specific example of SHAC's coordination of electronic civil disobedience was an e-mail from "shacuse@envirolink.org" that was disseminated on October 26, 2003. The subject line of the e-mail was "Electronic Civil Disobedience," and it advised SHAC supporters that on the following day, SHAC's website would provide a link to the SHAC–Moscow website where "electronic civil disobedience will be taking place." The e-mail stated that "participation is mandatory," and that by taking part in the coordinated electronic civil disobedience, supporters would "help . . . halt the ever important web medium for particular companies sponsoring Huntingdon." Participation would also "send[ ] a loud message that no silly injunctions or crooked politicians can derail the campaign to close Huntingdon." (J.A. at 2615.) [4]

---

4. In addition to the website, SHAC's newsletter provided support for direct action against Huntingdon. One issue featured a detailed map of Huntingdon's physical plant, inviting readers "to know your enemy's physical structure." After lauding the "liberation" of a group of beagles from "the very plan you see below," the newsletter encouraged readers to use the map to "stand up and fight." (J.A. at 1704–05.)

At trial, the government presented evidence that the cyberattacks against Huntingdon caused the company's computer systems to crash on two separate occasions, resulting in $400,000 in lost business, $50,000 in staffing costs to repair the computer systems and bring them back online, and $15,000 in costs to replace computer equipment.

### Protests Against Individuals

One of the strategies SHAC frequently employed was to target the employees of Huntingdon and affiliated companies, as well as their family members. To accomplish this goal, SHAC posted the names, home addresses, and home phone numbers of the individuals on the organization's website. SHAC also posted bulletins about what happened at the protests, including acts of vandalism committed by protestors.

#### 1. Andrew Baker [5]

Andrew Baker is the Chairman of Life Sciences Research, a holding company for Huntingdon. In 2000, Baker and his family began receiving mail and phone calls at his home in New York which he characterized as "very abusive" and "very vulgar." The protest activity corresponded with the posting of the following on SHAC's website:

"Target: Andrew Baker":

If there is one man on whom you could place the most blame for [Huntingdon's] crimes since 1998, it is him. For the last four years since he watched little dogs getting punched in the face, Baker has put his all into keeping Huntingdon

afloat. Not an easy job. As a trained chartered accountant Baker is skilled at pulling the financial strings of companies he is in charge of. . . . He currently works out of a NJ office called Focused HealthCare Partners LLC—which acts as a general partner for healthcare startups . . . or failing labs like Huntingdon. . . . Baker has been essentially reduced to scrambling full time to save Huntingdon. He has nothing else going for him. If [Focused HealthCare Partners] is the vehicle he uses to support Huntingdon, [Focused HealthCare Partners] is the company we must dismantle.

(J.A. at 937.)

SHAC posted a second page that was similar, this one entitled "TARGET: Focused Health Care Partners." (J.A. at 949.) This page listed the names and home addresses of several officers and employees of Focused Health Care Partners, including Andrew Baker. It also listed his wife's name.

There were frequent protests at Baker's home, including a painting of Baker's likeness on the sidewalk in front of his apartment building with a cross through his face. After one of these protests, the following post appeared on the SHAC website:

Forwarded from N.Y. activists as part of the N.Y. "March Mayhem" events:

. . .

Despite driving winds, rain, and cold weather 75+ activists gathered at [address redacted] to protest the home of Andrew Baker CEO to Huntingdon. Andrew Baker is at the top of our "SH&)%;!" list for his lead in trying to

---

5. The protests against Andrew Baker are discussed here as an example of the way in which SHAC targeted Huntingdon employees. There were several other Huntingdon employees who had similar experiences, including Henning Jonassen, who worked in the Pathol-ogy Department at Huntingdon; Darioush Dadgar, a Vice President at Huntingdon; Carol Auletta, Director of Program Management at Huntingdon; Mark Bibi, Huntingdon General Counsel; and Theresa Kushner, a veterinarian at Huntingdon.

save Huntingdon from certain closure. This was the largest and angriest of the 3 days of protest.... Andrew you and all your senior management and "science" staff have no idea what we have in store for you! Murderers, lairs [sic], thieves, and perverts deserve to be treated as such. In the near future when we see you in the gutter stripped of all your riches and fabricated respect, the only handout you will get is our spit!

(J.A. at 922.) Baker testified that protestors also targeted his daughter's New York apartment. He stated that vandals "plastered" the front door of her apartment "with posters and pictures ... depicting [his] death." (J.A. at 2834.)

A few weeks later, the SHAC website included a page entitled "Baker's Bloody Bungalow." (J.A. at 923.) The page warned, "You can run, but you can't hide!" and included photos of Baker's Los Angeles home from the street, as well as the complete street address and home phone number. The page also included the following commentary:

So, apparently Andy is bi-coastal (as if you couldn't tell). In addition to the 2 million dollar penthouse apartment he owns on NYC's upper Westside ( [address redacted] ), Baker also has a sunny California home in Los Angeles. This choice location on Sunset Plaza Drive should be the number one attraction on any animal rights activist's Hollywood star-map.

[House number redacted] is a million dollar home located at the top of a hill looking over LA. Its small entrance give a false appearance of being a small abode, but it drapes back down the mountainside several floors. The current occupant, when Andy is not in, is [name redacted], Baker's pampered stepson who rumor has it took a liking to some of LA's infamous cocaine.

(J.A. at 924.) Later, the following post appeared on the SHAC website:

Sent anonymously to aboveground activists in the US.... [V]ery late on November 9th, we visited the home of Andrew Baker, CEO of Huntingdon and most violent American terrorist, at [address redacted]. We spray painted messages like "Huntingdon SCUM" and "PUPPY KILLER" all over the garage, wall around the house, wooden door, and sidewalk in front, so that his neighbors will know what kind of person owns this house. We'd like to make it very clear that we're only warming up. This scumbag is not welcome here.

(J.A. at 927.) The post was attributed to "ALF," an acronym for the "Animal Liberation Front."

At trial, Baker testified that the house in Los Angeles has been attacked three times. He testified that during the first attack, the protestors kicked in the gate at the street entrance, broke the front door, and broke two windows. During the second attack, the protestors broke a window in the garage and threw a smoke bomb inside. During the third attack, the protestors threw rocks and tile over the wall, hitting the top and sides of the house, including windows and doors.

### 2. Sally Dillenback

Sally Dillenback is the senior executive in the Dallas office of Marsh, Inc., an insurance brokerage company that provided services to Huntingdon. She testified that in early 2002, she learned that SHAC had targeted Marsh. In March 2002, Dillenback checked the SHAC website after learning that personal information about employees had been posted there. When she viewed the website, she saw that her personal information had been posted, including the names of her husband and her children, as well as their home address,

the name of her children's school, the make, model and license plate of their personal vehicle, the name of their church, and the name of the country club where they were members.

Shortly after the information appeared on the SHAC website, Dillenback testified that her family began receiving phone calls, often "angry and belligerent," day and night, as well as a "tremendous" volume of mail. Dillenback testified that one morning, her family awoke to find that pictures of mutilated animals had been glued to the sidewalk in front of her home, as well as the exterior side wall of her home. At the same time, the following was posted on the SHAC website:

> received anonymously on March 10:
>
> Last night the homes of Dallas Marsh employees Michael Rogan and Sally Dillenback were visited by activists. Mr. Rogan's garage was plastered with stickers of mutilated puppies such as those his company insures. Mrs. Dillenback's side wall was covered in stickers, as was her mailbox.
>
> Let the stickers serve to remind Marsh employees and their neighbors that their homes are paid for in blood, the blood of innocent animals that are killed in labs like Huntingdon. Every day that Marsh insures Huntingdon, they insure death.

(J.A. at 1292.) Dillenback testified that after this incident, she was "sickened and terrified," and that her children were scared, especially the youngest child who was seven years old at the time. Marsh provided 24–hour security at her home following this incident.

Dillenback also received an e-mail that she perceived as a direct threat to her youngest son. She testified that the e-mail asked how she would feel "if they cut open my son . . . and filled him with poison the way that [Huntingdon] was doing to animals . . . ." (J.A. at 3004.) She testified

that this e-mail "devastated" her. She further testified that during this period of time, her husband purchased a semi-automatic weapon and that her seven-year-old son twice brandished a kitchen knife while inside the house in an effort to protect himself and the family.

After Dillenback initially testified regarding her son's use of the knife at her deposition, the following posting, attributed to "TX activists," appeared on the SHAC website:

> On Saturday, December 14, activists paid a holiday visit to Sally Dillenback, head of Dallas Marsh office. She was surprised, finding her working on her Christmas tree with her family. . . . Contrary to Sally's sworn testimony at her deposition, her son did not run for a kitchen knife and to hide when he saw the activists. Instead, he and his sister seemed quite interested in the signs and appeared to be trying to read them from across the street.
>
> Merry Christmas, Sally. Take a moment to think of all the dogs, like the one who shares your home, who will be spending Christmas in their own congealed blood and feces at Huntingdon, thanks in part [to] your company's insurance.

(J.A. at 1271.)

Dillenback testified that the protests stopped in early 2003, when Marsh stopped providing insurance brokerage services to Huntingdon. Notably, the SHAC website quoted a *Financial Times* article explaining that Marsh had dropped Huntingdon as a client on December 18, 2002.

### 3. Marion Harlos

Marion Harlos heads the San Antonio office of Seabury and Smith, a subsidiary of Marsh, Inc. As with Dillenback, she

learned from corporate headquarters that she had been targeted for protests on the SHAC website, which listed her home address and phone number. Within a week, there was a protest at Harlos's office. Protestors "bashed" in the door and threw pamphlets across the office while screaming, "You have the blood of death on your fingers," "We know where you live," "You cannot sleep at night," and "We will find you." (J.A. at 2993.) Seabury and Smith subsequently hired security guards for the San Antonio office.

Harlos testified that the protestors returned to the office a few weeks later. Although the security guard stopped most of the protestors, one made it inside, throwing pamphlets and screaming, "Puppy killer," and "We know where you live." (J.A. at 2994.) This protest was memorialized on the SHAC website as follows:

> Today around 11:30 am, 5 activists visited the San Antonio Marsh office . . . and gained access to the lobby.
>
> They rang the bell and a security guard answered, one activist made an attempt to get in past the guard and got half way in. It was enough to throw two or three dozen anti Huntingdon flyers into the air scattering and landing into the cubicles. All of the activist[s] screamed "puppy killer" and "we won't stop [until] you drop Huntingdon". As they left they banged on the windows and promised "next time we will be at your HOME".

(J.A. at 1282.)

Harlos testified that after this protest, she began receiving phone calls at her home late at night. She stated that sometimes the caller asked, "Are you scared? Do you think the puppies should be scared?" (J.A. at 2994.) Protestors, wearing bandanas and masks to conceal their faces, often sat in a car outside her residence between 4:00 A.M. and 6:00 A.M., watching her house. Then, protests began. One morning, nine activists were arrested outside Harlos's home and were charged with third-degree stalking. The SHAC website announced the arrests and urged its protestors to call the local police department in Texas to demand the protestors' release.

Harlos testified that she was "petrified" and frightened for her children, who were no longer permitted to play outside. (J.A. at 2995.) She also testified that her fear stemmed, in part, from her knowledge of what had happened to others who had been targeted by SHAC, including physical attacks. The activists continued to trespass on her property, despite an injunction that was intended to limit the permissible bounds of the protests. Harlos testified that the protests had a profound effect on her life, and the life of her family, ultimately forcing her to move to a new home. As with Dillenback, Harlos testified that the protests ceased when Marsh ended its business relationship with Huntingdon.

### 4. Robert Harper

Robert Harper is a property broker in Marsh's Boston office. In April 2002, his home address appeared on the SHAC website, and protests at his home began shortly thereafter. The protestors also engaged in other harassing activities, such as submitting an unauthorized mail-forwarding order to the United States Postal Service and posting advertisements for cars or concert tickets, listing Harper's home number. On Father's Day 2002, activists threw red paint on his front door. The following post subsequently appeared on the SHAC website:

> Received anonymously:
>
> Happy Father[']s [D]ay Rob Harper. I hope you liked our gift[.]

In the wee hours of the mourning (sic) on June 15, Marsh Boston Employee, Rob Harper [home address redacted] received an early Father[']s Day gift that he will never forget. A few gallons of red paint were thrown all over Harper's front steps and door. This left the front of his house caked in a huge pool of red paint.

Rob Harper is responsible for 500 animals dying within [Huntingdon] today and as long as Marsh has ties with [Huntingdon], Marsh will be a target. This also goes for any other company or business that has times [sic] with Huntingdon—

**_they will pay for it._**

There will be no rest for these murders. [Huntingdon] will be closed.

This action is dedicated to the 500 animals that were murdered inside of [Huntingdon] today.

Love,

The Animal Liberation Front

(J.A. at 1225 (emphasis in original).)

Harper testified that after these protests began, his workday was "consumed" with checking the SHAC website. He testified that he became aware of other protests and other targets, including the physical assault of Brian Cass in the United Kingdom, as well as protestors destroying vehicles. He stated that this made him feel "vulnerable" and "concerned for his family," as well as angry and helpless because his life was so profoundly disrupted. (J.A. at 2979–80.)

On August 9, 2002, Harper was at work when a protest occurred at his home. His wife called him, crying and frantic. He arrived home to find his wife and two-year-old son upset. The protestors outside were screaming "puppy killer" and threatening to burn the house down. A video played at trial showed that Lauren Gazzola, a Defendant in this case, was present at this demonstration, shouting into a bullhorn,

Where were the police when a [Huntingdon] worker's car got flipped over in his driveway? Where were the police when a Marsh executive had all his windows smashed in and his house covered in red paint in Chicago? And where were the police when your house was covered in red paint a few weeks ago? They can't protect you. Your injunctions can't stop us. We'll always find a way around whatever they throw at us.

(G.E. 4006; J.A. at 2980 & 2985; Appellee's Br. at 65–66.) Harper testified that this was "one of the worst days of [his] life." (J.A. at 2980.) He feared that someone would "throw a molotov cocktail" into the house, or that someone would physically assault him or his family. (J.A. at 2981.) He contemplated moving and quitting his job, but the protests stopped when Marsh ended its business relationship with Huntingdon.

## C.

### The Individual Defendants

In addition to SHAC, this case involves the following individual Defendants who participated in protest activity on behalf of the organization.

#### 1. Kevin Kjonaas

Kevin Kjonaas was the President of SHAC. Kjonaas lived at SHAC's Somerset, New Jersey, headquarters with two co-Defendants, Lauren Gazzola and Jacob Conroy.

Kjonaas's work on the campaign began in the United Kingdom. At trial, the government played a video of Kjonaas speaking at a workshop in Little Rock, Arkansas, about the origins of SHAC's campaign against Huntingdon. He described a ser-

ies of campaigns in England, dating back to 1996, that inspired SHAC's efforts. Those campaigns incorporated both legal and illegal tactics to shut down various animal-related enterprises. He described demonstrations during which protestors tore down fences surrounding the targeted facilities, and broke into buildings to "liberate" the animals kept inside. He relayed the early organizers' frustration with "the police trying to prevent [them] from doing what was right," and how those early organizers "pushed the police aside, ... opened up the fences, [and] took the animals out." (J.A. at 1830.) He described footage of another protest during which the demonstrators threw so many rocks onto the roof of one facility that the roof caved in, and every window in the building was smashed. Kjonaas described this as "one of the funniest things [he had] ever seen." (J.A. at 1833.) He described another protest where the demonstrators arrived at a targeted facility, which was also someone's home, and tore down newly-erected security fences, disconnected newly-installed security cameras, broke car windows, kicked in the front door, and evacuated the animals.

Although SHAC often attributed illegal activity to other organizations or anonymous sources, the government presented evidence that Defendants coordinated, directed and personally participated in the illegal acts. Here, we recount a sample of specific instances that demonstrate Kjonaas's involvement, in chronological order.

In the fall of 2000, a website called www.stephenskills.com was published online. The website explained that Stephens, an investor with Huntingdon, had provided a financial "bailout" for the lab. Under a heading labeled "Consequences," the site stated,

> We must show all other financial institutions via our actions against Stephens Incorporated that having any financial connections to Huntingdon will mean blocked up phone lines, flooded e-mail systemse [sic] and mailboxes, demonstrations outside and inside of offices, protests at the homes of the CEO's [sic] and company Directors....

(J.A. at 2861.) At trial, a Stephens employee testified that these threats became a reality in the fall of 2000. In January 2001, the Stephens employee met with Kjonaas at Kjonaas's request. As a precondition, Stephens asked Kjonaas to remove www.stephenskills.com from the internet. A few days later, the website was down. During their meeting, the two sides "agreed to disagree" about Huntingdon. Shortly thereafter, Stephens was targeted by a massive direct action campaign that included a "virtual sit-in," a protest that involved hundreds of activists attempting to access Stephens's website simultaneously and repeatedly in an effort to shut it down. Approximately 1,300 people participated in this virtual sit-in, which resulted in major disruptions to Stephens's day-to-day business operations.

When two members of the Huntingdon Board of Directors resigned in January 2003, Kjonaas led the effort to obtain the identities of the new directors so that SHAC could disseminate their personal information in order to target them. The record contains dozens of pages of transcribed phone calls between Kjonaas and various individuals that demonstrate his intense effort to obtain this information.

In a February 2003 phone call, Kjonaas discusses how "awesome" it was that a company had severed ties with Huntingdon only ten days after the protests began. Kjonaas explained that the campaign against Marsh had been an example of what would have happened if the target did not end its relationship with Hunting-

148

don. Kjonaas stated, "It's like how we beat Quilcap too."[6] (J.A. at 2240.)

In an e-mail exchange dated March 3, 2003, two members of SHAC discussed "resurrecting" the Animal Defense League of New Jersey ("ADL–NJ") for the purpose of attributing future protest activity to the organization in lieu of crediting the protests to SHAC. In the e-mail, Kjonaas told co-Defendant Darius Fullmer that using ADL–NJ is better than "making up other silly little groups that are going to be bound by ... injunctions." Kjonaas added that "SHAC is supposed to be a national 'communications' group and cannot ... take responsibility" for future protest events. (J.A. at 2612.)

In August 2003, a bomb exploded at the California offices of Chiron, Inc., a pharmaceutical company that was a Huntingdon client. SHAC posted a bulletin on its website announcing the explosion, stating that a group called "The Revolutionary Cells" claimed responsibility. In the post, Kjonaas was quoted as saying, "[T]his action against Chiron marks a drastic escalation in severity. Although SHAC–USA may share the same passion for ending injustice and closing Huntingdon, we know nothing more about 'The Revolutionary Cells' and their intentions. If I were Huntingdon or Chiron, I would be very worried." (J.A. at 1550.) Less than twelve hours after the bomb detonated, telephone records show that Kjonaas called Daniel

Andreas San Diego, the man later charged with the bombing.

### 2. Lauren Gazzola

Lauren Gazzola was the Campaign Coordinator for SHAC. She also lived at SHAC headquarters. In addition to coordinating protests on SHAC's behalf, Gazzola was personally involved in protests against targeted companies and individuals, including the protests against Marsh employee Robert Harper and a bombing of a Marsh subsidiary in Seattle.

The record reflects that several activists called to congratulate Gazzola after Marsh severed its relationship with Huntingdon. During a phone call with an incarcerated SHAC supporter, Gazzola talked about the successful protests against Marsh, saying "*we* fucked them up ... then they pulled out." (J.A. at 1935 (emphasis added).) As previously noted, Gazzola was videotaped participating in the protest of Robert Harper's home. During this protest she threatened to burn Harper's house down and warned that the police could not protect him or his family.

In July 2002, the Seattle offices of Guy Carpenter, a subsidiary of Marsh, were targeted with smoke bombs. The offices are located in two buildings, each with over twenty floors, which were evacuated after the bombs were detonated. Witnesses testified to "pandemonium" and

---

**6.** Quilcap was an investor in Huntingdon. In 1998, SHAC posted the home address and phone number of Quilcap's president, Parker Quillen, on SHAC's website. Quillen and his family began receiving harassing phone calls and mail at home. Some of the phone calls were of a threatening nature, including ultimatums that if Quilcap did not stop investing in Huntingdon, someone would harm his children. Protestors also vandalized his home, throwing paint on it and breaking windows. There were also a number of protests in front of his home. On February 13, 2002, someone

named "Lauren James" called Quillen's office and said that if Quilcap would "put something in writing" that it no longer had an interest in Huntingdon, then "Lauren's group w[ould] call off the campaign of harassment." (J.A. at 2955.) Quillen then directed Quilcap to divest itself of Huntingdon shares, and a notice appeared on the SHAC website, directing its activists to turn their attention to other targets because SHAC "had received a credible tip" that Quilcap was no longer involved with Huntingdon. (J.A. at 2955.)

"chaos" during the incident, in which at least 700 people, some with disabilities, were led down the stairs and into the street as the fire alarms sounded. Following the incident, SHAC posted the following statement on its website:

> Marsh and Guy Carpenter got smoked out of their holes today by alleged anonymous activists. Two whole buildings apparently were evacuated after becoming the target of military style smoke grenades, as one channel reported. As George W. Bush stated, we need to smoke these terrorists out of their holes. Insuring the murder of 500 animals every day is not acceptable. Note: As reported by some media outlets, SHAC is not affiliated with the attack, although we do support direct action as long as it does not hurt any animal, human, or nonhuman. We do not engage in, organize, or fund such activities. However, we do applaud those brave enough to do so.

(J.A. at 3010.) Videos of newscasts covering the bombing were subsequently found during a search of SHAC headquarters.

The day after the bombing, July 11, 2002, Lauren Gazzola, under the pseudonym "Angela Jackson," appeared on a Seattle-based radio talk show to defend the bombings. During the interview, Gazzola refused to condemn the beating of Brian Cass in the United Kingdom, stating,

> [I]t's hard to judge what you're going to do when you're in that situation, what would those animals do, I think they would fight back ... against the individual that is attacking him or her. . . . [P]eople that [sic] sympathize with those animals who cannot take that one themselves and they are carrying out the actions against those people who have the ability to stop suffering.

(J.A. at 2499–500.) With regard to the Seattle bombings, Gazzola stated that the action was justified, noting that the bombings were akin to "economic sabotage," effecting a huge disruption to Marsh and Guy Carpenter's day-to-day functioning, with the goal of forcing the companies to disassociate from Huntingdon. (J.A. at 2507–08.) In response to hostile callers who phoned in to challenge her viewpoint, Gazzola stated that the callers merely "proved her point," because when something controversial happens, like the Seattle bombings, people pay attention to the issue of animal cruelty, whereas normal coverage in the mainstream media garners little or no attention. (J.A. at 2510.) She also responded to criticism by stating, "this is the most successful campaign in the history of the animal rights movement and it's precisely because *we're* pushing the limits and *we're* tired of standing around holding signs and yelling at buildings and writing letters and not getting anywhere. *We're* gonna do what we have to do in order to be effective and in order to save lives." (J.A. at 2520 (emphasis added).)

### 3. Jacob Conroy

Jacob Conroy designed and maintained SHAC's websites and was the third resident of SHAC's Somerset headquarters. At trial, an expert testified that there were nine computers at the headquarters. The expert testified that two of the nine were used to "administer and publish" several web sites affiliated with SHAC, including www.shacusa.net, www.shacamerica.net, www.shacamerica.org, www.october29.org, and www.december1.net. (J.A. at 2691.) Conroy was a "frequent user" of those two computers. Other SHAC members looked to Conroy for technical assistance, including asking Conroy to create links on the website, and asking Conroy how to use "Dream Weaver," a program used to design web pages.

#### 4. Josh Harper

Josh Harper organized the Seattle branch of SHAC, which coordinated a campaign against Stephens, Inc. In the fall 2002 edition of the SHAC newsletter, Josh Harper wrote an editorial praising SHAC's "militant" tactics. When describing the movement's earliest days in the United Kingdom, he noted, "People who had spent years making money while happily laughing at beagles being punched in the face were now having their cars set on fire. Boo hoo." He also stated that while "animal abusers ... may be safe from the cops, the army, and the FBI ... they are not safe from us ... If no one else will treat them like the criminal scum that they are, at least we will.... It is time to go beyond our fear of reprisals." (J.A. at 1696.) Harper also gave speeches in Little Rock and Seattle, during which he similarly praised and advocated for the use of direct action in animal rights campaigns. The speech in Seattle included an explanation of how to send black faxes.

#### 5. Andrew Stepanian

Andrew Stepanian was a SHAC activist who coordinated protests in New York. In February 2003, Stepanian led a protest of approximately twenty people at a New York office of Deloitte and Touche, Huntingdon's auditor. After security refused to admit him to the building, Stepanian followed a pizza delivery person inside, and asked to speak to a Deloitte employee, Maureen Collins. When Collins arrived she asked Stepanian to leave, to which Stepanian responded that if Deloitte refused to talk to him, the organization would launch a "full-fledged campaign" against the company within 48 hours. Collins called the police, and a security guard grabbed Stepanian and escorted him out of the building. At that moment, the other protestors threw flyers from a third floor balcony, showering people below. They also chanted and plastered stickers throughout the interior of the building. The police arrived and detained one protestor, who later escaped. Stepanian recounted the incident in a telephone call with Gazzola, describing the protest as "freaking raucous" and "awe-inspiring." He asked Gazzola to "write it up" and disseminate it over the Internet. (J.A. at 2213–24.) The SHAC website subsequently posted a summary of the protest at Deloitte, attributing the report to "NY Activists." (J.A. at 1366.)

The record also reflects that Stepanian had a substantial role in organizing protests on behalf of SHAC, and he worked with Kjonaas and Gazzola to coordinate the protest calendar. For example, in a January 15, 2003 phone call, Stepanian told Kjonaas about his strategy for a "three days of action" protest in New York and New Jersey. When Kjonaas asked Stepanian, "What's gonna happen in Jersey?" Stepanian replied, "I can't say over the phone." (J.A. at 2028.) When discussing organizing a national protest, Stepanian explained that he wanted to attribute it to an "amorphous collective" that no one would recognize, rather than attach SHAC's name to it. (J.A. at 2029.) He and Kjonaas agreed to discuss the matter via encrypted e-mail.

#### 6. Darius Fullmer

Darius Fullmer was a Huntingdon campaign organizer in New Jersey. At trial, the government presented evidence that Fullmer's e-mail address was malignantx@aol.com, which is the same e-mail address that was often used to coordinate electronic civil disobedience via a Yahoo message board. For example, on August 30, 2001, Fullmer disseminated a message with the subject line "September SHAC Calendar." (J.A. at 851–52.) The message listed sev-

eral events for September, including names and facsimile numbers to use for "Black Fax Mondays" against Stephens, Inc. and Bank of New York. The record also reflects that Fullmer researched new corporate targets as well as the personal information of employees who worked for those companies. He assisted Gazzola in posting this information on the SHAC website to facilitate protests against these companies and individuals.

### D.
### Procedural History

On September 16, 2004, SHAC, Kjonaas, Gazzola, Conroy, Harper, Stepanian, and Fullmer were charged in a superceding indictment. Count One of the indictment charged that all six individual defendants conspired to violate the Animal Enterprise Protection Act, 18 U.S.C. § 43. Count Two charged SHAC, Kjonaas, Gazzola, and Conroy with conspiring to commit interstate stalking in violation of 18 U.S.C. § 2261A(2) and 18 U.S.C. § 371. Counts Three, Four, and Five charged SHAC, Kjonaas, Gazzola, and Conroy with substantive interstate stalking of Sally Dillenback, Marion Harlos, and Robert Harper, respectively. Count Six charged SHAC, Kjonaas, Gazzola, Conroy, and Harper of conspiring to use a telecommunications device to abuse, threaten, and harass in violation of 18 U.S.C. § 371 and 47 U.S.C. § 223(a)(1)(c).

On March 2, 2006, following a three-week trial, a jury convicted all Defendants on all counts. On September 12, 2006, the District Court sentenced SHAC to five years' probation; Kjonaas to 72 months' imprisonment; Gazzola to 52 months' imprisonment; Conroy to 48 months' imprisonment; Harper to 36 months' imprisonment; Stepanian to 36 months' imprisonment; and Fullmer to 12 months' imprisonment. Defendants filed a timely notice of appeal in this Court, challenging both their underlying convictions and sentences.

### II.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

### III.

■ The threshold issue is whether the AEPA is unconstitutional either on its face,[7] or as-applied to Defendants. This Court reviews challenges to the constitutionality of a statute under a *de novo* standard of review. *United States v. Weatherly*, 525 F.3d 265, 273 (3d Cir.2008).

### A.
### Constitutionality of the AEPA

#### 1. Void for Vagueness

■ Defendants argue that the AEPA violates the Due Process Clause and the First Amendment because the statute does not clearly define prohibited conduct. Specifically, Defendants argue that the terms "economic damage" and "physical disruption" are not clearly defined. As a result, Defendants argue that the statute has a chilling effect on speech because protestors will refrain from all speech, even protected speech, due to the ambiguity of what the statute proscribes. In addition, Defendants argue that the vague nature of the statute allows prosecutors to determine what conduct is covered by the

---

**7.** Defendants' overbreadth challenge is moot because the statute was superceded by the Animal Enterprise Terrorism Act in 2006. Therefore, we lack jurisdiction to address this issue. See, e.g., *Massachusetts v. Oakes*, 491 U.S. 576, 582–83, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989).

statute, inevitably permitting prosecutorial decisions based on content.

Defendants primarily argue that the goal of their political speech was to apply pressure to Huntingdon directly, as well as indirectly, by targeting associated companies, to force Huntingdon to change its practices. Defendants contend that this is an accepted and legal form of political protest protected by the First Amendment, and that the AEPA criminalizes protected behavior by proscribing "physical disruptions" with the intent to cause "economic damage." The government counters that the AEPA excepts "lawful" disruptions, therefore excluding all protected activity.

 "A statute is void on vagueness grounds if it: (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir.2008) (quoting *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). The inquiry is undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as-applied to the affected party. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992). "In the criminal context, the Supreme Court has held that since vagueness attacks are based on lack of notice, 'they may be overcome in any specific case where reasonable persons would know their conduct puts [them] at risk' of punishment under the statute." *Id.* (quoting *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (alteration in original)). Therefore, for a criminal statute to be constitutional, "criminal statutes need only give 'fair warning' that certain conduct is prohibited." *Id.* (quoting *Colten v. Kentucky*, 407 U.S. 104, 110,

92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)). "Simply because a criminal statute could have been written more precisely does not mean the statute as written is unconstitutionally vague." *Id.* (citing *United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975)). In addition, the Supreme Court has held that scienter requirements in criminal statutes "alleviate vagueness concerns," because a mens rea element makes it less likely that a defendant will be convicted for an action that he or she committed by mistake. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 149, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Furthermore, facial challenges to statutes, including challenges based on vagueness, are disfavored. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 128 S.Ct. 1184, 1191, 170 L.Ed.2d 151 (2008). The Court noted that "facial challenges ... run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks omitted).

The AEPA proscribes the use of an instrument of interstate commerce with the "*intent* [to] damage [or] cause [ ] the loss of any property (including animals or records) used by the animal enterprise...." 18 U.S.C. § 43(a) (2002) (emphasis added). The definitions section of the AEPA states that "'physical disruption' *does not include any lawful disruption* that results from lawful public, governmental, or animal enterprise employee reaction to the disclosure of information about an animal enterprise." 18 U.S.C. § 43(d)(2) (2002) (emphasis added). The AEPA also defines "economic damage" as "the replacement costs of lost or damaged

property or records, the costs of repeating an interrupted or invalidated experiment, or the loss of profits...." 18 U.S.C. § 43(d)(3) (2002).

We do not agree with Defendants that the AEPA is void for vagueness. First, the term "physical disruption" has a well-understood, common definition. Defendants argue that the term "physical disruption" could be read to proscribe legal protest activity, such as a letter-writing campaign, because that could be interpreted as an intent to cause a physical disruption resulting in economic loss to the targeted enterprise. However, the statute provides an exception that exempts *legal* protest activity from proscribed conduct. In this case, Defendants engaged in various "direct action" campaigns, which even SHAC's website concedes constitute illegal activity. Therefore, Defendants cannot argue that the statute was vague. The record is rife with evidence that Defendants were on notice that their activities put them at risk for prosecution, including the extensive use of various encryption devices and programs used to erase incriminating data from their computer hard drives. Because Defendants' conduct was clearly within the heartland of the statute, speculation as to the hypothetical ways that the AEPA could be unconstitutionally vague would require us to "formulate a rule of constitutional law broader than is required by the precise facts" before us.

Furthermore, Defendants were charged with *intending* to cause physical disruption to the functioning of an animal enterprise and to cause economic damages exceeding $10,000. *See* 18 U.S.C. § 43(b)(2) (2002). The scienter requirement means that the government must present the trier of fact with evidence that establishes that, beyond a reasonable doubt, the accused had the requisite intent to disrupt the functioning of an animal enterprise. As the Supreme

Court has stated, the inclusion of the scienter requirement in the statute alleviates vagueness concerns. *See Carhart*, 550 U.S. at 149, 127 S.Ct. 1610.

### 2. As–Applied

Defendants next argue that we should reverse their convictions for conspiracy to violate the AEPA because the statute is unconstitutional as-applied to them. Specifically, Defendants argue that their actions constituted political speech, and that the SHAC website neither incited violence nor constituted a true threat. Moreover, Defendants argue that their protected speech cannot be converted into unprotected speech by the independent action of others who engaged in illegal conduct.

The government contends that the conduct underlying Defendants' convictions is not protected by the First Amendment because, through the SHAC website, Defendants knowingly and purposefully adopted illegal means, including threats of violence and destruction of property, to achieve their political goals. More specifically, the government argues that the individual Defendants, via the SHAC website and their individual actions, promoted and coordinated both lawful and unlawful acts against Huntingdon and associated companies. The unlawful activity was comprised of "direct action," which included electronic civil disobedience (e.g., sending black faxes, crashing websites); providing the personal information of Huntingdon employees and companies associated with Huntingdon for the purpose of encouraging harassment, intimidation, and threats; encouraging animal "liberation"; and vandalizing private property. The government also argues that the individual Defendants personally participated in illegal protest activity.

We must first decide whether the content on the SHAC website, the cornerstone

of the government's case, is protected by the First Amendment. If so, the AEPA's criminalization of the speech on and through the website is unconstitutional.

■ All parties agree that the postings on the website speak to an issue of political, moral, and ethical importance in today's society—the humane treatment of animals. Therefore, the issues here fit squarely within the rubric of the First Amendment because they contribute to the "marketplace of ideas," as well as educate and urge others to action. Moreover, the speech at issue is speech that many find offensive and uncomfortable, which is precisely the type of speech that requires First Amendment protection. *See, e.g., Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (noting that speech "best serve[s] its high purpose when it induces a condition of unrest ... and stirs people to anger"). However, provocative political speech can run afoul of the First Amendment.

In *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Supreme Court held that the First Amendment "do[es] not permit [the government] to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. 1827. The Court elaborated by stating, "the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to

such action." *Id.* at 448, 89 S.Ct. 1827 (quotation marks omitted) (alteration in original); *see also United States v. Bell,* 414 F.3d 474, 483 n. 9 (3d Cir.2005) ("Under *Brandenburg,* only speech inciting imminent lawless action may be restricted." (emphasis omitted)). Therefore, for the speech at issue in this case to fall outside the purview of the First Amendment, this Court must determine that the speech (1) invited *imminent* lawlessness and (2) that the imminent lawlessness was *likely* to occur.[8]

■ However, while advocating violence that is not imminent and unlikely to occur is protected, speech that constitutes a "true threat" is not. *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In *Watts,* the Supreme Court distinguished a "true threat" from "political hyperbole," explaining that the latter is protected speech, while the former is not. In deciding whether speech constitutes a "true threat," a court should consider the totality of the circumstances and not just the words in isolation, whether the threat is "conditional," and the reaction of the listeners. *Id.* (noting that the defendant's words, "taken in context," were merely a "crude and offensive" method of making a political statement and did not constitute a true threat).

In this case, the record includes hundreds of pages of website printouts that depict screen shots of the SHAC website and other websites affiliated with SHAC or administered by SHAC's agents. These pages demonstrate several types of con-

---

**8.** The government argues that the Supreme Court's decision in *Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), supports an "exception" to *Brandenburg's* imminent incitement requirement. However, *Virginia v. Black* involved a prosecution under a Virginia statute that banned cross-burning with only the "intent to intimidate," and the

Supreme Court narrowed its holding to the context of cross-burning "because burning a cross is a particularly virulent form of intimidation," especially in the South. *Id.* at 363, 123 S.Ct. 1536. Therefore, we conclude that the *Virginia v. Black* analysis is not applicable in this case.

duct which the government alleges violated the AEPA. We can generally classify the conduct at issue as follows: "news"—like postings, allegedly from anonymous sources, that report on demonstrations *after* the demonstrations occurred; posts that listed the names, addresses and phone numbers of Huntingdon employees and the employees of associated companies; posts that coordinated physical demonstrations, including home demonstrations; posts coordinating electronic civil disobedience with the goal of flooding the Huntingdon servers, fax machines and phones, as well as those of companies affiliated with Huntingdon, and providing a link to software that enables a user to participate; and a post that included a reprint of a list of "Top Twenty Terror Tactics" that includes illegal conduct.

▆▆▆▆ We emphasize that much of the speech on the website does not run afoul of the *Brandenburg* standard. Coordinating demonstrations at the homes of Huntingdon employees, under the parameters set forth in injunctions, is not unlawful.[9] And merely posting information on unlawful acts that have already occurred, in the past, does not incite future, imminent unlawful conduct. Moreover, the publication of the "Top Twenty Terror Tactics," without more, is also protected, because although it lists illegal conduct, there is no suggestion that SHAC planned to imminently implement these tactics.[10] However, we find that the posts that coordinate electronic civil disobedience and disseminate the personal information of individuals employed by Huntingdon and affiliated companies are more problematic.

▆▆ Electronic civil disobedience is unlawful, as SHAC acknowledged on its website. When SHAC's website included links to the tools necessary to carry out virtual sit-ins, those posts were clearly intended to incite imminent, lawless conduct that was likely to occur. SHAC sometimes posted ongoing updates as virtual sit-ins progressed, noting that their efforts were having the desired effect because the Huntingdon servers were slowing down. As described above, an October 26, 2003, e-mail titled "Electronic Civil Disobedience," urged SHAC supporters to participate in electronic civil disobedience at a specified time. This message encouraged and compelled an imminent, unlawful act that was not only likely to occur, but provided the schedule by which the unlawful act was to occur. This type of communication is not protected speech under the *Brandenburg* standard.

With regard to the individual Defendants in this case, they attribute the illegal activity of the Huntingdon protestors to "anonymous activists" or unaffiliated organizations, and now argue that they cannot be held responsible for the illegal acts of others. However, there was ample evidence at trial to demonstrate that Kjonaas, Gazzola, Conroy, Stepanian, Harper and Fullmer coordinated and controlled SHAC's activities, both legal and illegal. Direct action, electronic civil disobedience, intimidation and harassment were part and parcel of SHAC's overall campaign, and these individual Defendants employed those tactics because they were effective. The record also supports a jury inference that these individual Defendants personal-

---

9. The website mentions that police were often on site to oversee the protests and to protect the targets of the protests.

10. The government attempts to connect the posting of the "Top Twenty Terror Tactics," which occurred on March 6, 2001, to later unlawful conduct, the earliest of which occurred on March 31, 2001. These events occurred a minimum of three weeks apart, which does not meet the "imminence" required by the *Brandenburg* standard.

ly participated in illegal protests, in addition to orchestrating the illegal acts of others. They personally took credit for the success of the direct action campaigns as companies discontinued their business dealings with Huntingdon, one by one. Kjonaas and Gazzola, in particular, worked the phones at SHAC headquarters, confirming that various companies had severed ties with Huntingdon. As soon as Kjonaas or Gazzola received written confirmation, the protests stopped-strongly suggesting that they, on behalf of SHAC, had substantial control over the entire campaign. In addition, the individual Defendants held up the successes of the illegal campaigns as an example to other companies they targeted, in furtherance of their conspiracy to violate the AEPA.

Further, other conduct constituted "true threats," which also removes Defendants' speech from the realm of First Amendment protection. In particular, Defendants used past incidents to instill fear in future targets. For example, SHAC displayed placards with photos of Brian Cass after his beating, with his injuries highlighted in red, at protests. Indeed, they attributed the quick exit of some targets, such as Deloitte and Touche, to the past experiences of employees at companies like Stephens and Marsh. In this regard, their actions meet the standard of a "true threat" as articulated in *Watts*, because viewed in context, the speeches, protests, and web postings, were all tools to further their effort. Moreover, given the success of the campaign in the past, including the destruction of private property and the telecommunication attacks on various companies, the implied threats were not conditional, and this speech rightly instilled fear in the listeners.

We therefore conclude that some of the speech on SHAC's website, viewed in context, is not protected by the First Amend-

ment. Likewise, we find that any Defendant who created or disseminated that speech, or who personally participated in illegal activity, is likewise not protected by the First Amendment. We discuss the individual Defendants below.

### a. Kjonaas

As discussed above, Kjonaas delivered a speech at the workshop in Little Rock, in which he praised the use of violent techniques. While distasteful, we find that this is protected speech. There is no evidence that the speech was intended to incite anyone to participate in imminent and likely unlawful action. However, when we view the speech in context—alongside the overwhelming evidence that Kjonaas was deeply involved in the coordination and execution of illegal protest activity—the speech informs us of his state of mind. We agree with the District Court's conclusion that Kjonaas's conviction for conspiring to violate the AEPA is not prohibited by the First Amendment.

The record contains more instances of Kjonaas's involvement in and coordination of illegal activity than we could possibly recount here. Suffice it to say that, as detailed above, Kjonaas's metaphorical fingerprints were all over several of SHAC's illegal activities. Perhaps the clearest example is his involvement with the campaign against Stephens. Prior to Kjonaas's meeting with the Stephens representative to discuss Stephens's investment with Huntingdon, the Stephens representative asked Kjonaas to shut down www.stephenskills.com, a website that encouraged electronic civil disobedience. Within days, the website was down. After the meeting, during which Stephens refused to stop dealing with Huntingdon, an illegal direct action campaign against Stephens escalated. It is equally telling that Kjonaas's telephone records indicate

that he called the person responsible for the Chiron bombing in Seattle hours after it happened. These are only representative samples of Kjonaas's direction and coordination of the direct action campaign, but viewed in context, we do not find that his First Amendment rights have been violated.

### b. Gazzola

■ One of the more incriminating pieces of evidence against Gazzola was her participation in the demonstration at the home of Robert Harper. The government showed a video at trial, in which Gazzola can be heard threatening to burn down Harper's house and warning him that the police cannot protect him. Under the *Watts* framework, this act, viewed in context with Gazzola's other conduct, constitutes a true threat and is sufficient to remove her protest activity from First Amendment protection.[11]

We find it hard to see how threatening to burn down someone's house is "political hyperbole" such that it might be protected by the First Amendment in the first place. However, even assuming that it has some underlying political value, viewed in the totality of the circumstances, this constituted a "true threat." When this protest took place, Robert Harper and his family had been a target of the campaign for a few weeks. Robert Harper was keenly aware of what was happening, and what had happened, to others who had been targeted during the campaign to close Huntingdon, including the physical assault on Brian Cass. He lived in fear that something similar would happen to his family, and from the record, his fear of the protestors acting on their threats was reasonable. Gazzola could reasonably foresee that Harper would interpret her words as a serious expression of intent to harm Robert Harper and his family.

Even assuming Gazzola had not made these threats at the Harper demonstration, the record establishes that Gazzola, like Kjonaas, was instrumental in the planning and execution of SHAC's illegal activities. She repeatedly employed illegal tactics as one of the strategies used to further SHAC's overall goal of closing Huntingdon.

### c. Conroy

■ Conroy, who designed and maintained the websites on behalf of SHAC, has the most obvious connection to the postings regarding electronic civil disobedience, which instigated imminent, illegal activity, because he was responsible for posting the content on the Internet. Therefore, given his level of control over the website, our conclusion that SHAC's website coordinated electronic civil disobedience alone requires the conclusion that Conroy's actions in this regard do not warrant First Amendment protection.[12]

---

11. Gazzola was arrested and charged in the Commonwealth of Massachusetts for this specific protest activity outside of Robert Harper's home. The Massachusetts court dismissed the charges on First Amendment grounds. Gazzola's counsel raised this issue in the District Court when he moved for a new trial following Gazzola's conviction in this case. After a hearing during which both parties were fully heard, the District Court concluded that the Massachusetts court's ruling was on a narrow set of facts, limited only to Gazzola's conduct outside Robert Harper's home, and that the state court did not consider the entire course of conduct, including involvement in the website and other protests, at issue in this case. We agree with the District Court on this issue.

12. We address Conroy's argument that the evidence connects him to website administration only after the conspiracy terminated in section V., *infra*.

158

#### d. *Stepanian*

In a recorded telephone conversation with Gazzola, Stepanian described a protest he coordinated inside the New York offices of Deloitte and Touche, Huntingdon's auditor. After security refused to admit Stepanian into the building, he followed a delivery person inside, and spoke to the office manager. The office manager ejected Stepanian from the building, at which time other protestors threw paper and plastered the inside of the building with stickers. Although Stepanian clearly accepted responsibility for this action in the phone call with Gazzola, the protest was nonetheless attributed to "New York activists." Stepanian himself provided strong circumstantial evidence of his planning and execution of illegal protest activity in a phone conversation with Kjonaas. When Kjonaas asked Stepanian what his plans were, Stepanian replied that he could not share the information over the phone, presumably for fear that the phone was wiretapped.

#### e. *Fullmer*

■ Fullmer, operating under an e-mail address that the government identified as belonging to him, coordinated illegal protest activity on behalf of SHAC via a Yahoo message board. This activity included inciting the readers to participate in "Black Fax Mondays" against Stephens, Inc. and Bank of New York. Like Conroy, Fullmer's speech incited others to commit illegal acts at a designated time and place, which meets the *Brandenburg* standard, removing it from the realm of protected speech.

#### f. *Harper*

■ The government primarily argues that Harper coordinated a SHAC campaign in Seattle, and that he gave speeches advocating and explaining electronic civil disobedience. During its summation, the government emphasized Harper's coordination of speeches in Seattle, his long-standing friendships with some of his co-Defendants, and his visit to a Deloitte and Touche office in Seattle during which it appears he did nothing illegal.

Harper also gave speeches, including one in which he explained how to send "black faxes" and wrote an editorial in which he endorsed militant action. He called Kjonaas to express his surprise and pleasure with SHAC's successes, and he e-mailed Kjonaas asking for speakers to travel to Seattle to speak on behalf of the organization and the movement. Harper's personal conduct does not cross the line of illegality; to punish him simply on the basis of his political speeches would run afoul of the constitution. However, his conduct, as discussed *infra*, does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy to violate the AEPA. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) ("The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.") Accordingly, the application of AEPA to him is not unconstitutional.

#### 3. *Conclusion*

We hold that the AEPA is not void for vagueness and is not unconstitutional as-applied to all Defendants.

### IV.

■ We next address Defendants' contention that the District Court improperly instructed the jury with regard to the elements of Count One, Conspiracy to Violate the AEPA. We have plenary review of the legal standard used by the District Court, and we review the District Court's choice

of wording for an abuse of discretion. *United States v. Yeaman*, 194 F.3d 442, 452 (3d Cir.1999).

Defendants primarily argue that the District Court improperly permitted the jury to consider SHAC's protest activity against companies associated with Huntingdon, which were not "animal enterprises," as evidence of a conspiracy to violate the AEPA. Defendants point to the legislative history of the AEPA, noting that it was not until 2006 that the statute incorporated "damaging" or "causing" a loss to "a person or entity having a connection to, relationship with, or transactions with an animal enterprise." 18 U.S.C. § 43(a)(2)(A) (2006).

We disagree with Defendants' characterization. The government's evidence showed that the ultimate object of the conspiracy was to cause a physical disruption—which the jury instruction defined as "interference with the normal course of business or activity"—at Huntingdon resulting in damage to Huntingdon. In this regard, Defendants' actions against third parties associated with Huntingdon properly provided circumstantial evidence of Defendants' conspiracy to violate the AEPA, even though they were actually prosecuted and convicted for their conduct toward third parties under the stalking and telecommunications statutes.

Defendants next argue that the District Court erred when it instructed the jury that they could convict Defendants if the jury found only that Defendants *intended* to cause a "loss of property" exceeding $10,000. Defendants argue that the proper instruction would have required the jury to find that Defendants *actually caused* a "loss of property" in excess of $10,000. Even assuming, *arguendo*, that the District Court's instruction was erroneous, the error would have been harmless. The government presented ample

evidence at trial that Defendants' protest activity directed at Huntingdon actually caused Huntingdon a loss well over $10,000. *See* Section I.B., *supra* (noting that the electronic civil disobedience directed toward Huntingdon cost the company $400,000 in lost business, $50,000 in staffing costs to repair the computer systems and bring them back online, and $15,000 to replace computer equipment).

Defendants next contend that the District Court improperly instructed the jury that "damage or loss of any property . . . used by the animal enterprise" does not include "loss of profits." Defendants argue that the District Court should have instructed the jury that they first had to "find damage or loss of any property used by the animal enterprise," or a conspiracy to do so. If the jury found such damage or a conspiracy to cause such damage, Defendants argue that only then should the jury have calculated economic damage, which includes lost profits.

Defendants' reading of the statute only helps them if the government did not prove a loss exceeding $10,000, exclusive of lost profits. As previously noted, Huntingdon had to pay $15,000 to replace computer equipment after a protest involving electronic civil disobedience.

We have considered all the remaining arguments the individual Defendants make regarding errors in the jury instructions for Count One, and we conclude that no further discussion is necessary. We therefore conclude that the District Court properly instructed the jury with regard to Count One.

## V.

The next issue on appeal is whether there was sufficient evidence to support the jury's guilty verdict. We conduct an "independent review" of the entire record

because First Amendment principles are involved. *United States v. Kosma*, 951 F.2d 549, 555 (3d Cir.1991) (internal quotation marks omitted).

## A.
### Count One—Conspiracy to Violate the AEPA

To prove a conspiracy to violate the AEPA, the government was required to demonstrate the following beyond a reasonable doubt: (1) that the Defendants conspired, that is, they agreed with one another and/or with others; (2) to use a facility in interstate or foreign commerce; (3) for the purpose of causing physical disruption to the functioning of Huntingdon; and (4) to intentionally damage or cause the loss of property to Huntingdon.[13] 18 U.S.C. § 43(a) (2002). In addition, the Defendants were charged, under the penalty component of the statute, with causing economic damage exceeding $10,000. *Id.* § 43(b)(2).

Defendants contend on appeal that there was insufficient evidence to prove the third and fourth of these elements: Defendants acted for the purpose of causing physical disruption to Huntingdon and to intentionally damage or cause the loss of Huntingdon's property. The AEPA expressly provides that "the term 'physical disruption' does not include any lawful disruption that results from lawful public, governmental, or animal enterprise employee reaction to the disclosure of information about an animal enterprise." 18 U.S.C. § 43(d)(2) (2002). This exception underpins Defendants' argument that they agreed to use

only lawful protest activity with the objective of closing Huntingdon. We note at the outset of this discussion that Defendants' sufficiency arguments are largely tied to their argument that the AEPA was unconstitutional as-applied.

■ The government need not introduce direct evidence to establish a conspiratorial agreement. *United States v. McKee*, 506 F.3d 225, 238 (3d Cir.2007). Rather, the government can prove the agreement with circumstantial evidence, "based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme." *Id.* (citations omitted). Defendants in this case unquestionably agreed to advocate for animal rights as members and agents of SHAC. However, Defendants cannot be convicted solely because of their associations, because such a conviction would clearly run afoul of the First Amendment's guarantee of freedom of association. *See, e.g., N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 918–19, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *McKee*, 506 F.3d at 238. To establish a conspiracy under these circumstances, the government must " 'establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.' " *McKee*, 506 F.3d at 239 (quoting *Claiborne Hardware*, 458 U.S. at 920, 102 S.Ct. 3409). This evidence must be judged "according to the strictest law," or the *"strictissimi juris* doctrine." *Id.* (internal quotation omitted). However, the

---

**13.** The District Court, in its charge on the general law of conspiracy, required the government to prove an overt act in furtherance of the conspiracy for each of the conspiracy counts. However, so far as the AEPA was concerned, the language of the statute did not require an overt act. *See* 18 U.S.C. § 43(a)(2) (2002). The court should not infer such a

requirement. *See Whitfield v. United States,* 543 U.S. 209, 213, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) ("[W]here Congress had omitted from the relevant conspiracy provision any language expressly requiring an overt act, the Court would not read such a requirement in the statute.").

government need not show that each and every member of the conspiracy committed an unlawful act in furtherance of the conspiracy's goals.

█ Even applying this strict standard, we find that the government provided evidence beyond association to prove the conspiracy with regard to SHAC, Kjonaas, Gazzola, Conroy, Harper, Stepanian and Fullmer.

While there is no direct evidence that the Defendants expressly agreed to participate in the conspiracy and further its unlawful goals, there is ample circumstantial evidence from which the jury could have inferred their agreement to do so. Kjonaas and Gazzola had leadership positions in SHAC, an organization that clearly engaged in unprotected activity via its website.[14] Kjonaas and Gazzola were instrumental in the coordination of all of SHAC's activities, both legal and illegal. There is also overwhelming evidence of their constant attempts to evade law enforcement and cover their tracks: use of encryption devices and programs to wipe their computer hard drives; attributing illegal activities to fake organizations and activists; and the use of pseudonyms. While alone this evidence is not enough to demonstrate agreement, when viewed in context, it is circumstantial evidence of their agreement to participate in illegal activity. *See, e.g., United States v. Pearl-*

*stein,* 576 F.2d 531, 535 (3d Cir.1978) (citing *United States v. Cohen,* 516 F.2d 1358, 1367 (8th Cir.1975)).

Ample circumstantial evidence demonstrates that Conroy and Fullmer agreed to participate in this conspiracy. Conroy resided with Kjonaas and Gazzola in the Somerset, New Jersey headquarters of SHAC. Using computers located there, he designed and maintained multiple websites affiliated with SHAC—the primary tools of the campaign against Huntingdon. He frequently posted on these websites detailed information regarding when and how SHAC supporters could participate in illegal campaign activities. These postings at times included warnings and threats of violence against SHAC's targets, with the intent of intimidating those targets into complying with SHAC's demands. This strong circumstantial evidence supports the conclusion that Conroy agreed to participate in the conspiracy. Similarly, Fullmer, via the e-mail address malignantx@aol.com, personally coordinated electronic civil disobedience via internet message boards. It is inconceivable that he could now argue that he never agreed to participate in illegal activity—he personally orchestrated it.

There is sufficient circumstantial evidence from which the jury could infer that Harper also agreed to participate in this conspiracy. Harper organized a Seattle

---

14. SHAC, as a corporation, can act only through its agents. In this case, Kjonaas was the only true agent of SHAC because he was the only named officer of the corporation. Given the relationship between Kjonaas, SHAC, and the events at issue in this case, a finding that Kjonaas agreed to participate in the conspiracy clearly permits the imputation of criminal liability to SHAC. See *United States v. Sain,* 141 F.3d 463, 474–75 (3d Cir. 1998) ("If an agent of the corporation conspires with another individual, the corporation for which the individual is the agent may be criminally liable."); *Mininsohn v. United*

*States,* 101 F.2d 477, 478 (3d Cir.1939) ("It is well settled law that the guilty intent of officers of a corporation may be imputed to the corporation itself in order to prove the guilt of the corporation."); see also Erik D. Paulsen, Note, Imposing Limits on Prosecutorial Discretion in Corporate Prosecution Agreements, 82 N.Y.U. L.Rev. 1434, 1447 (2006) (noting that a corporation may be held liable for an agent's actions if the agent acts within the scope of his/her employment and his/her action is for the benefit of the company, and that this standard of liability is relatively easy to satisfy).

branch of SHAC and a local campaign against Stephens, a company targeted by SHAC. In a lengthy telephone conversation with Kjonaas, Harper enthusiastically discussed recent events in the SHAC campaign and future strategies. He wrote editorials and gave speeches praising militant tactics and direct action. These included a speech in Seattle in which he explained how the audience could send black faxes, a primary tool in SHAC's campaign. In that speech Harper declared, "I think that it's appropriate to have a militant response . . . to go after them with everything at . . . our hands. Anything that we have available to use and do our utmost to shut them down." (J.A. at 2531.) From this constellation of evidence the jury could reasonably conclude that Harper conspired with others and shared the purpose of causing unlawful physical disruption and damage to property at Huntingdon.

The circumstantial evidence of Stepanian's agreement is not as overwhelming as the evidence against his co-Defendants, but there is enough to support the jury's conclusion beyond a reasonable doubt. Stepanian, like Kjonaas and Gazzola, had a leadership position within SHAC. He alluded to his coordination of illegal activity in a phone call with Kjonaas when he explained to Kjonaas that he could not explain over an unprotected phone line what protest activity he had planned for

the following weeks in New York and New Jersey. He worked with Kjonaas to attribute illegal activity to sham organizations, and he led an illegal protest at Deloitte and Touche.[15]

We therefore conclude that there was sufficient evidence for the jury to conclude, beyond a reasonable doubt, that SHAC, Kjonaas, Gazzola, Conroy, Stepanian, Harper and Fullmer agreed to participate in a conspiracy to violate the AEPA.

To the extent that Defendants challenge the sufficiency of the evidence with regard to the other elements of Count One, we reject those arguments.[16] As we discussed in section IV, *supra*, we find that the object of Defendants' conspiracy was to cause a physical disruption to Huntingdon, an animal enterprise, and to intentionally damage or cause the loss of property.

B.

*Counts Two, Three, Four, and Five— Conspiracy to Commit Stalking and Substantive Stalking*

SHAC, Kjonaas, Gazzola and Conroy were convicted of conspiracy to commit interstate stalking, in addition to aiding and abetting substantive interstate stalking of Sally Dillenback, Marion Harlos, and Robert Harper, respectively.

---

15. We recognize that Deloitte and Touche is not an "animal enterprise" as defined by the AEPA. We also recognize that under the 2002 version of the statute, violation of which Defendants were charged and convicted, participation in a campaign against Deloitte and Touche and other indirectly affiliated companies is not, by itself, enough to substantiate a conspiracy to violate the AEPA. However, with regard to Defendants' agreement to participate in illegal activities to further their goals, we must view the record in its entirety, and not look only to their agreement to participate in activities directed against Hunting-

don. *United States v. Smith,* 294 F.3d 473, 481 n. 2 (3d Cir.2002) (quoting *United States v. Migliorino,* 238 F.2d 7, 9 (3d Cir.1956)).

16. Defendants in this case cross-reference portions of their co-Defendants' briefs. It is difficult to discern what arguments each Defendant intended to raise, or more specifically, how to label them, given the similarities between their arguments regarding sufficiency of the evidence, their challenges based on the First Amendment, and the jury instructions.

 Interstate stalking is proscribed by 18 U.S.C. § 2261A. To prove stalking, the government must establish (1) Defendants used a facility of interstate commerce; (2) to engage in a course of conduct with the intent to place a person in reasonable fear of death or serious bodily injury either to that person or to a partner or immediate family member; and (3) the course of conduct actually put that person in reasonable fear of death or serious bodily injury to himself or his partner or immediate family member. *See, e.g., United States v. Wills,* 346 F.3d 476, 493–94 (4th Cir.2003). To prove a conspiracy to commit interstate stalking, the government must also prove that the charged defendants agreed to participate in a conspiracy to commit interstate stalking. Finally, with regard to "aiding and abetting," a defendant is punishable as the principal if the government establishes, beyond a reasonable doubt, that either the defendant committed the stalking or "aid[ed], abet[ted], counsel[ed], command[ed], induce[d] or procure[d]" the substantive act of stalking by another person. 18 U.S.C. § 2.

### 1. Kjonaas

 Kjonaas argues that the government failed to produce sufficient evidence of his intent to place the victims in reasonable fear of serious bodily injury or death, as required by the interstate stalking statute. Specifically, he argues that he only intended to harass, "make the [victims'] lives miserable," cause "emotional distress," and "embarrass" the victims. (Kjonaas Br. at 78–79.) He contrasts the intention to inflict this type of emotional distress with the statute's requirement that he intend to put the victim in "reasonable fear of death or bodily injury."

We disagree. SHAC invoked Brian Cass's injuries to instill fear in others targeted by the campaign; SHAC activists constantly used ultimatums when they targeted individuals, threatening "or else" if the companies failed to sever their ties with Huntingdon; following the Chiron bombing, Kjonaas noted the escalation in the "severity" of the campaign and warned that Huntingdon and Chiron should be "very worried." The SHAC website boasted that "anonymous activists" had arranged for an undertaker to collect a target's body, and the "Top 20 Terror Tactics" mentions physical attacks and threats to kill and injure as effective means of protest. The website discussed Andrew Baker's "bloody" California bungalow, with the line, "You can run, but you can't hide!" In addition, the SHAC website celebrated extreme acts of vandalism by posting photographs of overturned vehicles and houses splattered with red paint. Kjonaas knew that all of this information was widely available on the internet, and that when Dillenback, Harlos, and Harper were targeted, they could easily discern what had happened to those who came before them and feel intimidated accordingly.

### 2. Gazzola and SHAC

 Gazzola argues that the government failed to establish that the alleged threats were communicated to the targets, and that there was insufficient evidence that the targets' fear of bodily harm was reasonable. SHAC also makes the latter argument.

We can reject these arguments with little discussion. Gazzola personally stood outside of Robert Harper's house and threatened to burn it down, and warned that the police could not protect him. All of the stalking victims-Sally Dillenback, Marion Harlos, and Robert Harper-testified that they were aware that they had been targeted. Dillenback testified that she received an e-mail in which someone

asked her how she would feel if someone "cut open her son and filled him with poison." All the stalking victims testified that they were afraid for their safety, and the safety of their families, because they knew what had happened to Brian Cass and others who preceded them in this campaign.

### 3. Conroy

█ Finally, Conroy argues there was insufficient evidence to convict him of all stalking-related counts. The crux of his argument is that he was tied to the conspiracy through his work administering the website, of which there was proof only after the 2003 seizure of the computers from SHAC headquarters. He argues that because the government charged him with involvement in a conspiracy that ended in December 2002, his involvement with SHAC in 2003 does not suffice to convict him of a conspiracy that had already terminated. With regard to the substantive stalking counts, Conroy argues that there is insufficient evidence that he posted information about Dillenback, Harlos, and Robert Harper on the website, and that the government cannot prove that he was even aware of the nature of the campaign against those individuals.

Conroy's argument ignores evidence of his involvement beyond the evidence that he was the primary user of computers used to administer SHAC's websites. There was evidence that Conroy managed SHAC's website as early as August 2001, which predates the start date of the government's charged conspiracy. Documents that contained confidential business records for Bank of New York were posted in August 2001, and those same documents were found in a folder labeled with Con-

roy's name in SHAC's office. In addition, Conroy created his PGP account, which he used to communicate with his co-Defendants and other SHAC activists, in January 2002. The record is also peppered with evidence of his involvement with the campaign well before the termination of the conspiracy in December 2002.

With regard to Conroy's arguments about his lack of personal involvement in the stalking, we note that the government charged him with aiding and abetting, and not as a principal. Given Conroy's overall course of conduct, the jury could conclude beyond a reasonable doubt that Conroy maintained the website, the primary tool that made the stalking possible. The website not only communicated the victims' personal information, but the website also disseminated the information that made the victims' fears reasonable: threats that people associated with Huntingdon would be treated like Brian Cass, photos of extreme vandalism, ultimatums, and threats. Conroy's involvement as website administrator, which the jury could conclude predated the end of the conspiracy, made the stalking, if not the entire campaign, possible.

### C.

### Count Six—Conspiracy to Use a Telecommunications Device to Abuse, Threaten and Harass

SHAC, Kjonaas, Gazzola, Conroy and Harper were convicted of conspiracy to use a telecommunications device to abuse, threaten and harass, in violation of 47 U.S.C. § 223(a)(1)(c). SHAC and Harper challenge the sufficiency of the evidence on this count. We find that SHAC's arguments are frivolous, and do not require a response.[17] We reject Harper's argu-

---

**17.** SHAC argues (1) that facsimile transmissions do not fall within the ambit of the tele-

communications statute; (2) even if the transmission of "black faxes" does fall within 47

ments for the reasons discussed above in reference to Count One.

## VI.

Defendants raise a host of additional arguments pertaining to evidentiary objections and challenges to the reasonableness of their sentences. We have carefully reviewed their arguments, and we find them to be without merit. However, we note that all parties concede, and we agree, that the District Court erred when it failed to devise a payment schedule for the $1,000,001 in restitution. *See United States v. Lessner,* 498 F.3d 185, 201 (3d Cir.2007) ("We have held that a district court commits plain error when, having ordered full restitution, it fails to state on the record the manner and schedule of payments after taking into account the defendant's financial resources."). As a result, we remand to the District Court for that purpose.

## VII.

For the foregoing reasons, we will affirm the convictions and sentences of Defendants SHAC, Kevin Kjonaas, Lauren Gazzola, Jacob Conroy, Andrew Stepanian, Joshua Harper and Darius Fullmer. Finally, we remand to the District Court to create a payment schedule for the restitution ordered.

FISHER, Circuit Judge, dissenting.

I write separately to express disagreement with my colleagues' conclusions regarding the sufficiency of the evidence to convict the Defendants on Count One, the conspiracy to violate the Animal Enterprise Protection Act (AEPA). Although I agree with most of the majority's analysis

as to why the AEPA is constitutional on its face and as applied to the Defendants, I part company with my colleagues in assessing whether the Government in fact proved that the Defendants committed a conspiracy to violate the AEPA. This issue, though narrow, is nonetheless significant for this case. In light of the statutory prohibitions of the AEPA and the evidence that the Government presented at trial, I cannot conclude that there was sufficient evidence, as a matter of law, to convict the Defendants of conspiring to violate the AEPA. Therefore, I would reverse the convictions as to all Defendants on this count.

The majority states that the issue in controversy on appeal is whether there was sufficient evidence that Defendants conspired to cause "physical disruption to the functioning of Huntingdon" and to "intentionally damage or cause the loss of property to Huntingdon." Majority Op. at Part V.A. I would frame the central issue differently, instead asking whether there was sufficient evidence that the Defendants formed an agreement, the purpose of which would violate the AEPA, and had the specific intent to further this illegal goal. *See Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."). While this distinction is subtle, its effect on how one views the Government's evidence is not.

In reviewing the Defendants' challenge to the sufficiency of the evidence, we must view the evidence in the light most favor-

U.S.C. § 223(a)(1)(c), there was insufficient evidence of an intent to harass; and (3) that the telecommunications statute applies only

to persons initiating the transmission and not to those who provide information that describes and directs the illegal transmissions.

able to the Government and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Here, the version of the AEPA under which the Defendants were convicted prescribes punishment for anyone who

> "(1) ... uses or causes to be used the mail or any facility in interstate or foreign commerce for the purpose of causing physical disruption to the functioning of an animal enterprise; and
>
> (2) intentionally damages or causes the loss of any property (including animals or records) used by the animal enterprise, or conspires to do so."

18 U.S.C. § 43(a) (2002). Accordingly, to prove a conspiracy to violate this statute, the Government needed to demonstrate that the Defendants formed an agreement to "cause[ ] physical disruption to the functioning of an animal enterprise" and to "damage[ ] or cause[ ] the loss of any property ... used by the animal enterprise," and that each Defendant had the specific intent to further this agreement.[18]

I agree with the majority that proving a conspiracy, in general, requires the Government to establish an agreement among the group to accomplish unlawful goals and the specific intent on the part of each individual to further those illegal goals, *see* Majority Op. at Part V.A. (quoting *United States v. McKee*, 506 F.3d 225, 239 (3d Cir.2007)); nonetheless, to prove a particular type of conspiracy requires establishing that the goals were ones prohibited by a specific law. That is, a goal can only be considered unlawful in reference to a particular prohibition. Here, the prohibition at issue is physically disrupting an animal enterprise and intending to cause damage or loss to its property in violation of the AEPA.

In discussing the Defendants' insufficiency of the evidence argument, the majority simply states: "[W]e find that the object of Defendants' conspiracy was to cause a physical disruption to Huntingdon, an animal enterprise, and to intentionally damage or cause the loss of property." Majority Op. at Part V.A. As support for this statement, the majority refers back to an earlier portion of the opinion, in which it addresses the Defendants' argument that the District Court incorrectly instructed the jury on the elements of the conspiracy to violate the AEPA charge. However, the portion of the opinion to which the majority refers simply asserts, without any concrete examples or support from the record, that the "government's evidence showed that the ultimate object of the conspiracy was to cause a physical disruption—which the jury instruction defined as 'interference with the normal course of business or activity'—at Huntingdon resulting in damage to Huntingdon." Majority Op. at Part IV. I fail to see how the evidence relied upon by the Government and recounted by the majority establishes that the object of the conspiracy was to cause physical disruption at Huntingdon.

On the contrary, the evidence that the majority describes throughout its opinion consists primarily of either conduct that was directed at companies affiliated with Huntingdon—such as an investment banking company (Stephens, Inc.), a pharmaceutical client (Chiron), an insurance broker (Marsh, Inc.), and an auditor (Deloitte

---

**18.** The parties do not dispute that the Internet qualifies as a facility in interstate commerce and that Huntingdon meets the definition of an animal enterprise. *See* 18 U.S.C. § 43(d)(1)(A) (2002) (defining "animal enterprise" as a "commercial ... enterprise that uses animals for ... research[ ] or testing").

& Touche)—and the employees of those companies—e.g., Sally Dillenback, Marion Harlos, and Robert Harper—or "illegal activity" in a very general sense. More specifically, to highlight a few examples, the majority discusses "a massive direct action campaign" targeted at Stephens, Inc., which involved a protest with "hundreds of activists attempting to access Stephens's, website simultaneously and repeatedly in an effort to shut it down"; "a protest of approximately twenty people at a New York office of Deloitte and Touche," during which "protestors threw flyers" and "chanted and plastered stickers"; the coordination of "Black Fax Mondays" targeted at "Stephens, Inc. and Bank of New York"; "the extensive use of various encryption devices and programs used to erase incriminating data from [certain Defendants'] computer hard drives"; and the publication of "the personal information of Huntingdon employees and companies associated with Huntingdon for the purpose of encouraging harassment, intimidation, and threats." While I of course do not condone this type of conduct, and I do not dispute that this evidence sufficed to convict the various Defendants on the interstate stalking and the telecommunications harassment counts, I fail to see any evidence of an agreement to cause physical disruption to Huntingdon—as opposed to other non-animal enterprise companies affiliated with Huntingdon—or to cause damage or loss to property used by Huntingdon.[19]

Notably, at the time the Defendants were prosecuted, the AEPA did not criminalize harassment of employees of an animal enterprise or employees of companies affiliated with an animal enterprise. Rather, in 2006 Congress amended the statute to authorize punishment for anyone who:

"uses ... any facility of interstate or foreign commerce—

(1) for the purpose of damaging or *interfering with the operations* of an animal enterprise; and

(2) in connection with such purpose—

(A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or *any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;*

(B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family ... of that person, or a spouse or intimate partner of that person by a course of conduct involving *threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation;* or

(C) conspires or attempts to do so."

---

**19.** Perhaps the best evidence of an agreement to violate the AEPA that the majority cites is its reference to "posts coordinating electronic civil disobedience with the goal of flooding the Huntingdon servers, fax machines, and phones, as well as those of companies affiliated with Huntingdon." Majority Op. at Part III.A.2. This evidence is stronger than the rest because it involves conduct actually directed at Huntingdon as opposed to only third parties. But without any cite to the record or

specific examples of the Defendants targeting Huntingdon, this reference is nothing more than an unsupported characterization of the evidence that the Government now offers of what it presented at trial. Moreover, even if record support for targeting Huntingdon's servers, fax machines, and phones existed, this conduct is hard to fit within the language of the AEPA, which prohibits causing a physical disruption *not* an electronic disruption.

18 U.S.C. § 43(a) (2006) (emphasis added). Significantly, the amended act allows liability to be premised upon causing damage to the property of any person, or entity, having a connection with an animal enterprise and threatening, harassing, or intimidating any such person. Additionally, the amended act does not require that the defendant cause "physical disruption" and instead prohibits "interfering" with the operations of an animal enterprise. Thus I acknowledge that the Government's case against these Defendants would be much stronger if they were prosecuted under the current version of the AEPA. However, the version of the AEPA that the Defendants were charged with violating did not prohibit mere interference with the operations of an animal enterprise nor did it proscribe targeting companies and employees that were affiliated with an animal enterprise and, therefore, proof that the Defendants engaged in this type of conduct was not a sufficient basis for convicting them under the AEPA.

As the majority discusses in the context of the void for vagueness arguments, "Defendants were charged with intending to cause physical disruption to the functioning of an animal enterprise and to cause economic damages exceeding $10,000." Majority Op. at Part III.A.1. While I would add, to be precise, that the AEPA requires an intent to cause *both* physical disruption to the animal enterprise *and* damage or loss of property of the animal enterprise (amounting to at least $10,000),

a finding of specific intent is clearly required to convict the Defendants of violating this statute.[20] Therefore, it is not enough to show intent to engage in illegal actions; rather, the Government needed to prove specific intent to further a goal that, if accomplished, would violate the AEPA in order to convict for the conspiracy charged in Count One. But, due to the lack of evidence demonstrating the Defendants' specific intent to facilitate the physical disruption of and damage to or loss of property used by Huntingdon, the majority relies on only general statements about the Defendants' illegal activity. For example, the majority states that Kjonaas violated the AEPA through his "involvement in and coordination of [more instances] of illegal activity than we could possibly recount here"; Gazzola was "instrumental in the planning and execution of SHAC's illegal activities," having "repeatedly employed illegal tactics" as part of the strategy to close down Huntingdon; Conroy "instigated imminent, illegal activity" by posting information regarding civil electronic disobedience on SHAC's website; Stepanian "provided strong circumstantial evidence of his planning and execution of illegal protest activity" based on a conversation during which Stepanian told Kjonaas he could not share information over the phone; Harper "coordinated a SHAC campaign in Seattle," indicated his "pleasure with SHAC's successes," "gave speeches" on how to send "black faxes" and "wrote an editorial in which he endorsed militant action"[21]; and Fullmer "coordinated illegal

---

20. Specific intent is necessary to demonstrate a substantive violation of the AEPA and is required to prove a conspiracy of any sort. *See Salinas*, 522 U.S. at 65, 118 S.Ct. 469; *United States v. Wexler*, 838 F.2d 88, 90–91 (3d Cir.1988).

21. The majority concedes that "Harper's personal conduct does not cross the line of illegality; [and] to punish him simply on the basis of his political speeches would run afoul

of the constitution." Majority Op. at Part III.A.2. Nonetheless, the majority finds that Harper's conduct "does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy to violate the AEPA." *Id.* In my view the majority's statement that "Harper's personal conduct does not cross the line of illegality" does not distinguish him from the other Defendants because there is likewise

protest activity on behalf of SHAC via a Yahoo message board," which provided information about transmitting black faxes to Stephens, Inc. and Bank of New York. Majority Op. at Part III.A.2. Of course, the Government, and not the majority, is at fault for this lack of evidence of the Defendants' specific intent to violate the AEPA because it failed to adduce the necessary evidence of this purpose and intent at trial.

In sum, even when the evidence is viewed in the light most favorable to the Government, it simply does not establish that the Defendants entered into an agreement, the purpose of which, if accomplished, would violate the statutory provisions of the AEPA, and that they likewise had the specific intent to further this particular goal. While the Government's evidence tended to prove that the Defendants conspired together to put economic pressure on Huntingdon to close its facilities by targeting companies that did business with Huntingdon, as well as their employees, and furthered this goal through a campaign of intimidation and harassment, the Government's evidence did not prove an agreement to cause physical disruption to Huntingdon and damage to property it used. For this reason, I would reverse each Defendant's conviction on Count One, because no rational trier of fact could have found the essential elements of the crime of conspiracy to violate the AEPA beyond a reasonable doubt.

no direct evidence that the other Defendants "expressly agreed to participate in the conspiracy and further its unlawful goals." Majority Op. at Part V.A. I disagree that there is sufficient circumstantial evidence to allow a jury to infer a conspiracy to violate the AEPA on the part of Harper or the other Defendants.